UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| FRANKLIN JONES, |
| *Plaintiff*, |
| v. |
| NATCHAUG HOSPITAL, INC., |
| *Defendant*. |

Civil No. 3:17cv1099 (JBA)

September 25, 2019

**RULING GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Franklin Jones filed this action against his former employer, Defendant Natchaug Hospital ("Natchaug"), claiming violations of the Connecticut Fair Employment Practices Act ("CFEPA") and Title VII of the Civil Rights Act of 1964. Plaintiff claims that Natchaug's decision to promote another employee over him was motivated by discrimination on the basis of race and sexual orientation. Defendant moves for summary judgment ([Doc. # 32]), which Plaintiff opposes ([Doc. # 39]). For the reasons that follow, Defendant's motion for summary judgment is granted.

**I. Background**

Plaintiff was employed by Defendant as a Registered Nurse from May 2014 through December 2016. (Parties' L.R. Stmts. [Doc. ## 34, 39-1] ¶¶ 1, 29.) In addition to a Bachelor of Arts in Psychology from Central Connecticut State University earned in 1999, Plaintiff has a Diploma in Nursing from the University of Connecticut, earned in 2004; a Bachelor of Science in Nursing ("BSN") from the University of Connecticut, earned in 2013; and a Master of Science in Nursing ("MSN") from the University of Connecticut, earned in March 2016. (Ex. 16 (Resume) to Ex. 5 (Jones Aff.) to Pl.'s Opp. to Def.'s Mot. for Summ. J. [Doc. # 39-3] at 1.) Plaintiff has

worked as a Registered Nurse since 2005. (*Id.*) From March 2010 to May 2014, he was the Assistant Nurse Manager at Alcohol Drug Recovery Center, Inc. in Hartford, Connecticut. (*Id.*)

In June 2016, Natchaug created and posted an opening for a new Nurse Manager position on the night shift. (*Id.* ¶ 3.) The job posting included that a BSN was required and an MSN was preferred. (*Id.* ¶ 9.) It noted that a successful applicant was required to have "[s]trong communication, interpersonal and leadership and teambuilding skills" as well as "good organizational skills," and the ability "to work with others, take direction, and work varying hours." (Ex. A (Job Posting) to Ex. 1 (Sullivan Aff.) to Def.'s L.R. Stmt. [Doc. # 34-1].) The Nurse Manager would be "responsible for the coordination, management and supervision of the unit staff, including nursing staff, clinical and therapy staff as assigned." (*Id.*)

Gino D'Eliseo, then a Registered Nurse at Natchaug Hospital, was the first applicant to express interest in the new Nurse Manager position. (*Id.* ¶ 4.) Mr. D'Eliseo has a 1990 Bachelor of Science in Marketing from Central Connecticut State University and a 2013 Associate's Degree in Nursing from Goodwin College School of Nursing. (Ex. 15 (D'Eliseo Resume) to Pl.'s Opp. [Doc. # 39-3] at 1.) While employed by Defendant, Mr. D'Eliseo had volunteered to be trained as a "Super User" during Natchaug's implementation of two new programs, the EPIC medical records management program and the Pyxis medication management program. (*Id.*) In that role, he served as an expert for other employees with questions about those programs. (*Id.*) Mr. D'Eliseo also had experience managing a restaurant. (Ex. 3 (Tr. of Jones Dep.) to Pl's Opp. [Doc. # 39-3] at 66.)

Mr. D'Eliseo interviewed for the open position on July 22, 2016 with Gale Sullivan, Defendant's Regional Director of Nursing. (Parties' L. R. Stmts. ¶ 4.) He interviewed again on August 8, 2016 with Nurse Managers Susan Woodman and Amanda Watkins, as well as the

Regional Medical Director, Nursing Supervisors, and other nurses and mental health workers from the unit. (*Id.*)

Ms. Woodman asked Plaintiff whether he planned to apply for the open Nurse Manager position, and several weeks later, on August 15, 2016, Plaintiff applied. (*Id.* ¶ 7; Jones Dep. at 30.) He interviewed that day with Ms. Sullivan and Ms. Watkins separately, and with Ms. Woodman a few days later due to scheduling conflicts. (Parties' L. R. Stmts. ¶¶ 7-8.) During her interview with Plaintiff, Ms. Sullivan discussed some concerns regarding his follow-through on a project designed to reduce patient falls, as well as some issues with scheduling. (*Id.* ¶ 7; Sullivan Aff. ¶ 15; Pl.'s Dep. at 32-33.) Following his interview, Ms. Sullivan, Ms. Woodman, and Ms. Watkins discussed Plaintiff's clinical and managerial strengths and weaknesses and decided not to conduct a second round of interviews with Plaintiff. (Parties' L.R. Stmts. ¶ 17.) Laurie Clinton, Regional Director of Human Resources, agreed with that decision. (*Id.*)

Ms. Sullivan made the decision to hire Mr. D'Eliseo as the new Nurse Manager following discussions with Ms. Woodman, Ms. Watkins, and Ms. Clinton about each candidate's degrees, leadership skills, and operational skills. (*Id.* ¶ 16.) According to Ms. Sullivan, her decision was based on her "conclu[sion] that Mr. D'Eliseo was a stronger candidate for the Nurse Manager position due to demonstrated leadership skills." (Ex. 1 (Sullivan Aff.) to Def.'s L.R. Stmt. [Doc. # 34-1] ¶ 17.) "Based on" his interview performance and Ms. Sullivan's "knowledge of his employment record," she "believed that Mr. D'Eliseo had demonstrated considerable leadership skills in his time at Natchaug, and had also demonstrated initiative by, for example, volunteering to serve as a Super User . . . . He was dedicated, enthusiastic, and well thought of by both staff and management." (*Id.* ¶ 11.) Ms. Sullivan represents that "Mr. D'Eliseo had significant managerial

3

experience from his career before he entered nursing" and "agreed to enroll [] in a BSN program." (*Id.* ¶¶ 12-13.)

On September 2, 2016, before the decision was announced publicly, Plaintiff was informed that another employee had been hired to fill the open Nurse Manager position. (Parties' L.R. Stmts. ¶ 19.) During that meeting, Ms. Sullivan gave Plaintiff feedback about why he was not chosen for the open position. (*Id.* ¶ 20-21; Sullivan Aff. ¶ 20.) She also offered to mentor Plaintiff for a leadership position, offered to send him to internal leadership classes, and provided a list and schedule of those classes.[1] (*Id.* ¶ 20-21; Sullivan Aff. ¶ 20.)

On September 13, 2016, Plaintiff filed a discrimination complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") claiming that the decision to promote Mr. D'Eliseo was influenced by Plaintiff's "race (African-American), color (black), and sexual orientation." (Ex 4. (Verified Answer of Respondent) to Pl.'s L.R. Stmt. [Doc. # 39-3]; *see* Ex. 1 (Amended CHRO Complaint) to Pl.'s L. R. Stmt. [Doc. # 39-3]; Parties L.R. Stmts. ¶ 24.)

On November 21, 2016, Plaintiff submitted a resignation later to Defendant by email, indicating that his last day of work would be December 11, 2016 and that he was leaving for a job at Windham Hospital. (Parties' L.R. Stmts. ¶ 25.) Defendant Natchaug Hospital and Windham

---

[1] Plaintiff told Ms. Sullivan that he would "get back to her" about those offers. (Parties' L.R. Stmts. ¶ 22.) On September 19, 2016, Plaintiff emailed Ms. Sullivan to accept her offers of mentorship and leadership classes, and he indicated that he would resume his work on the project to prevent patient falls. (*Id.*) However, Plaintiff did not enroll in the leadership classes and relinquished control of the fall project, despite Ms. Woodman's efforts to talk him out of doing so. (*Id.* ¶ 23.) Plaintiff testified that "the hours that [were] allocated for" those classes were not "enough." (Pl.'s Dep. at 67.) But as Plaintiff's decision not to continue with the offered classes followed Defendant's decision to promote Mr. D'Eliseo, it cannot have influenced that promotion decision.

4

Hospital are both Hartford HealthCare facilities. (Ex. A (Pl.'s Email to Woodman and King) to Ex. 3 (Clinton Decl.) to Def.'s L.R. Stmt. [Doc. # 34-3].)

Between November 21 and December 8, 2016, a Licensed Practice Nurse ("LPN") working with Plaintiff reported that she witnessed Plaintiff pocketing a patient's medication and that Plaintiff encouraged her to take some too, due to the medication's high street value. (Parties' L.R. Stmts. ¶ 26.) While Defendant investigated this report, Plaintiff was placed on a paid administrative suspension. (*Id.* ¶ 27.) During this time, Ms. Sullivan and the Human Resources department took statements from employees, reviewed medication documentation, and reported the matter to the Department of Public Health as required. (*Id.*)

On December 8, 2016, Plaintiff and his union representative were scheduled to meet with Ms. Sullivan, Ms. Clinton, and others concerning the LPN's allegations. (*Id.* ¶ 28.) Before that meeting, Plaintiff met with his union representative. (*Id.*) The representative advised Plaintiff that he should resign from his position at Natchaug effective immediately, instead of waiting until December 11, 2016. (*Id.*) That day, Plaintiff sent a second resignation email to Defendant, "confirming [his] resignation at Natchaug Hospital effective immediately." (*Id.* ¶ 29.)

Plaintiff was not told the results of any investigation into the allegations by the LPN, but he was told by his union representative that an investigation was conducted. (Pl.'s Dep at 142-43.) Plaintiff concluded that the investigation did not find anything because otherwise his license would have been suspended. (*Id.*)

Plaintiff asserts that when he arrived at Windham Hospital on December 12, 2016 for orientation, he was told that he was not cleared to begin orientation there and that his job offer had been rescinded. (*Id.* at 143; Pl.'s Decl. [Ex. 5] to Pl.'s L.R. Stmt. [Doc. # 40] ¶ 51.)

## II. Discussion

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

"The moving party bears the initial burden of showing why it is entitled to summary judgment." *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Where, as here, the nonmovant bears the burden of proof at trial, the movant may show prima facie entitlement to summary judgment in one of two ways: (1) the movant may point to evidence that negates its opponent's claims or (2) the movant may identify those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact, a tactic that requires identifying evidentiary insufficiency and not simply denying the opponent's pleadings." *Id.* at 272–73 (citing *Celotex*, 477 U.S. at 323). "If the movant makes this showing in either manner, the burden shifts to the nonmovant to point to record evidence

6

creating a genuine issue of material fact." *Id.* (citing Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Like the movant, the nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Id.* (citing *Celotex*, 477 U.S. at 324; *Matsushita*, 475 U.S. at 586).

### A. Failure to Promote

Plaintiff challenges the decision to promote Mr. D'Eliseo under both Title VII and the CFEPA. Employment discrimination claims under CFEPA and Title VII are analyzed using the same substantive standards. *See Rivera v. Thurston Foods, Inc.*, 933 F. Supp. 2d 330, 338-339 (D. Conn. 2013) (citing cases). First, "[u]nder the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, . . . a plaintiff complaining of a discriminatory failure to [promote] must first make out a prima facie case of discrimination." *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "Once the plaintiff has made such a prima facie showing, the burden shifts to the employer to come forward with a nondiscriminatory reason for the decision not to [promote] the plaintiff." Once the employer articulates a nondiscriminatory reason, the burden shifts back to the Plaintiff "to adduce admissible evidence that would be sufficient to permit a rational finder of fact to infer that the employer's proffered reason is pretext for an impermissible motivation." *Id.* (internal quotations and citations omitted).

#### i. Prima Facie Showing

The Supreme Court in *McDonnell Douglas*

> provided a framework for a prima facie claim based on an alleged discriminatory failure to promote as follows: plaintiff must allege that (1) []he is a member of a protected class; (2) []he applied and was qualified for a job for which the employer was seeking applicants; (3) []he was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications.

7

*Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709 (2d Cir. 1998) (internal quotations omitted). This standard is "not inflexible" and simply requires the Plaintiff to show that he "was rejected under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Defendant "assume[s]" "[f]or purposes of [its] Motion for Summary Judgment . . . that Jones can meet the minimal burden necessary for establishing his prima facie case." (Def.'s Mem. Supp. Mot. for Summ. J. [Doc. # 33] at 8.) Plaintiff argues that as a "gay, African-American male," he is a member of two protected classes, and that as an "RN with an advanced Degree," he was qualified for the advertised Nurse manager position. (Pl.'s Opp. at 5-6.) Plaintiff was rejected when Mr. D'Eliseo was hired. Plaintiff argues that the decision to promote Mr. D'Eliseo gives rise to an inference of discrimination because Mr. D'Eliseo, a heterosexual white male, is not a member of either of Plaintiff's protected classes. (*Id.* at 6.)

These facts are sufficient to make a prima facie showing of discrimination under Title VII and the CFEPA, and Plaintiff has met his burden at the prima facie stage.

### ii. Legitimate Nondiscriminatory Reason

Defendant claims several legitimate nondiscriminatory reasons for its decision to promote Mr. D'Eliseo instead of Plaintiff. First, Mr. D'Eliseo applied for the open Nurse Manager position before Plaintiff and had already completed his second round of interviews by the time Plaintiff applied. (Def.'s Mem. at 9; Parties' L.R. Stmts. ¶¶ 4, 7.) Plaintiff applied for the open position only after Ms. Woodman "approached" him about it, and he waited "probably like three or four weeks" to apply after that conversation with Ms. Woodman. (Pl.'s Dep. at 30:14-18.) Second, based on his interview and employment history, Ms. Sullivan believed that Mr. D'Eliseo

demonstrated "considerable leadership skills" both at Natchaug and in his career before nursing and had demonstrated "initiative" by volunteering to serve as a Super User to assist other staff in implementing new technologies. (Def.'s Mem. at 9; Parties' L.R. Stmts. ¶¶ 11-13.) Third, Ms. Sullivan had concerns with Plaintiff's work performance, including his failure to follow through on a project. (Def.'s Mem. at 9; Sullivan Aff. ¶ 15; Pl.'s Dep. at 32-33.)

Defendant's burden at this stage "is one of production, not persuasion," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000), and Natchaug has met that burden.

### iii. Pretext

Because Defendant has proffered a legitimate nondiscriminatory reason for its decision to promote Mr. D'Eliseo, Plaintiff must demonstrate that those reasons "were not [Defendant's] true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. Defendant is entitled to summary judgment in its favor only if it can "demonstrate the absence of a genuine issue of material fact" as to the reason for the failure to promote Plaintiff to the Nurse Manager Position. *See Salahuddin*, 467 F.3d at 272-73.

In arguing that the stated reasons for promoting Mr. D'Eliseo are pretext for discrimination, Plaintiff focuses on a comparison of his education and employment history with that of Mr. D'Eliseo. Plaintiff argues that he was significantly more qualified than Mr. D'Eliseo for the Nurse Manager position, and so Defendant's decision cannot have been based on the candidates' qualifications as Ms. Sullivan represents that it was. (Pl.'s Opp. at 6-7.)

Specifically, Plaintiff claims that D'Eliseo "did not have the minimum credentials required for the position" because he lacked a BSN. (Pl.'s Opp. at 6.) Plaintiff also points out that Mr. D'Eliseo's "background management experience was in the restaurant business," not in the nursing field. (*Id.*) In contrast, Plaintiff has "significant years of nursing experience, held both the

9

minimum credential of the BSN and the preferred criteria of a Masters in Nursing," and "had worked in a supervisory capacit[y] in nursing prior to coming to Natchaug Hospital." (*Id.* at 6-7.)

Defendant responds that Plaintiff has "failed to . . . identify any evidence that even suggests a link between either his color race or his sexual orientation and the hiring decision" and that Defendant therefore is entitled to summary judgment on Plaintiff's failure to promote claims. (Def.'s Mem. at 10.) Defendant points specifically to two portions of Plaintiff's deposition testimony that demonstrate, in its view, that Plaintiff cannot meet his burden of showing pretext. Regarding his sexual orientation, Plaintiff testified:

> Q: Did you ever hear Ms. Sullivan or Ms. Woodman make comments about gay employees or gay patients?
>
> A: No.
>
> Q: Other than the fact that you are an open gay male, do you have any reason to believe—any other reason to believe either Gale [Sullivan] or Susan [Woodman] would discriminate against you on the basis of your sexual orientation?
>
> A: No.

(Pl.'s Dep. at 43.) Regarding his race, Plaintiff testified:

> Q: And it's my understanding that your claim is I'm Black, Gino [D'Eliseo] is Caucasian, and thus I'm discriminated against because I'm black; is that true? Is that your belief?
>
> A: Yes.

(*Id.* at 44.)

In the absence of any other evidence of discrimination, Plaintiff must rely only on the asserted difference in credentials between himself and D'Eliseo to show that Defendant's decision to promote Mr. D'Eliseo was discriminatory. (*See* Pl.'s Mem. at 7 (arguing that "[t]he Court

10

should find the defendant's proffered legitimate nondiscriminatory reason for selecting Mr. D'Eliso over the plaintiff to be a pretext, as it is not based in fact" only because "[i]t is clear from all objective indices that Mr. D'Eliseo was less qualified than the plaintiff").) But when

> a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination. In effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.

*Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F. 3d 93, 103 (2d Cir. 2001). In applying that standard, courts should "bear in mind that 'Title VII is not an invitation for courts to sit as a super-personnel department that reexamines employers' judgments.'" *Moy v. Perez*, 712 F. App'x 38, 42 (2d Cir. 2017) (quoting *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 73 (2d Cir. 2015)). Even where "a rational finder of fact could reasonably conclude that [the plaintiff] was more qualified than" a successful candidate not part of the plaintiff's protected class, "th[at] evidence of disparity in qualifications, standing alone, falls short of establishing a discriminatory motive." *Walsh v. New York City Housing Authority*, 828 F.3d 70, 78 (2d Cir. 2016). Because Plaintiff's claim relies solely on an alleged disparity in qualifications, he must demonstrate that his credentials are "so superior to" those of Mr. D'Eliseo that "no reasonable person, in the exercise of impartial judgment, could have chosen" Mr. D'Eliseo over Plaintiff for the nurse manager position. *Byrnie*, 243 F.3d at 103.

Plaintiff argues that his education and years of experience alone demonstrate that he was "so superior" to Mr. D'Eliseo. (Pl.'s Supp. Opp. to Def.'s Mot. for Summ. J. [Doc. # 45] at 2.) He asserts that "Mr. D'Eliseo was not qualified at all" while the Plaintiff was "highly qualified." (Pl.'s

11

Opp. at 7.) But the job posting for the nurse manager section listed many requirements under the "Qualifications" section, only some of which focused on education and experience. (Job Posting.) Plaintiff's education and experience were a better match for the objective "Experience Requirements" and "Education Requirements" listed, which included "Ten years of nursing experience," "Five years inpatient psychiatric unit leadership experience," "BSN required," and "MSN preferred." (*Id.*) But listed in the same "Qualifications" section under "Other" are several requirements which are more subjective in nature: "Demonstrated critical thinking and sound decision making skills," "Strong communication, interpersonal and leadership and teambuilding skills required," "Must have good organizational skills," "Ability to set priorities and meet deadlines," "Must be able to work with others, take direction and work varying hours," and "Computer proficiency and keyboarding skills." (*Id.*)

According to Ms. Sullivan, Mr. D'Eliseo "had demonstrated considerable leadership skills in his time at Natchaug, and had also demonstrated initiative by, for example, volunteering to serve as a Super User to assist other employees during the implementation of two new computer systems." (Sullivan Aff. ¶ 11.) She described Mr. D'Eliseo as "dedicated, enthusiastic, and well thought of by both staff and management." (*Id.*) In contrast, Ms. Sullivan "had some concerns about [Mr. Jones'] performance and leadership skills up to that point," including that he "had failed to follow through on a Falls Project designed to reduce patient falls, had some attendance and tardiness issues, and had not exhibited initiative" as Mr. D'Eliseo had. (*Id.* ¶ 15.) "As a result of" her interviews with Mr. Jones and Mr. D'Eliseo, Ms. Sullivan "concluded that Mr. D'Eliseo was a stronger candidate . . . due to demonstrated leadership skills." (*Id.* ¶ 17.)

In describing Mr. D'Eliseo as "not qualified" and himself as "highly qualified," Mr. Jones focuses only on the objective requirements of the nurse manager job posting. Plaintiff ignores

12

that while he was better qualified with regard to education and years of experience, Ms. Sullivan determined that Mr. D'Eliseo was better qualified in terms of the "[o]ther" requirements listed equally as "Qualifications" on that job posting. Plaintiff offers no evidence to suggest that Ms. Sullivan's conclusions about the candidates' subjective qualifications were inaccurate or motivated by discrimination. The record lacks any evidence which might call into question Ms. Sullivan's conclusion that Mr. D'Eliseo demonstrated stronger leadership skills or better initiative during his time at Natchaug.

In choosing among candidates, an employer is "permitted to value certain job qualifications over others." *Shah v. MTA New York City Transit*, 687 F. App'x 32, 34 (2d Cir. 2017). Moreover, "there is nothing unlawful about an employer's basing its hiring decision on subjective criteria, such as the impression an individual makes during an interview" so long as the "employer's explanation of its reasons [is] clear and specific" and is "reasonably attributable to an honest even though partially subjective evaluation of qualifications." *Byrnie*, 243 F.3d at 104-05 (internal quotations and alterations omitted). And a plaintiff's "plain[] disagree[ment] with [the employer's] relative assessments" of applicants' subjective qualities is insufficient "to defeat summary judgment on the ground of pretext," especially in the absence of any evidence or "objective reasons why" the plaintiff's "direct supervisors with the greatest familiarity with the quality of his work[] were wrong in determining that" he did not meet expectations. *Turner v. NYU Hospitals Center*, 470 F. App'x 20, 24 (2d Cir. 2012).

Plaintiff's argument here amounts to a disagreement with Ms. Sullivan's assessment of the two candidates and with the weight she placed on each candidate's qualifications. His argument appears driven by the belief that the objective qualifications, including education and experience, should have been weighed more heavily than the subjective qualifications, like interpersonal and

13

leadership skills and interview performance. But Natchaug was not obligated to weigh the many "[q]ualifications" listed on the job posting in the manner Plaintiff suggests. Defendant was free to "value certain job qualifications over others," including by "basing its hiring decision on subjective criteria." Moreover, the job posting itself does not indicate that the objective qualifications are of greater importance than the subjective qualifications. Rather, the job posting treats the objective and subjective qualifications equally, listing four subsections under the "Qualifications" header: "Experience Requirements," "Education Requirements," "Licensure/Certifications Required," and "Other." (Job Posting.) A BSN was "required," but "[s]trong communication, interpersonal and leadership and team building skills" were also "required." (*Id.*) Thus Mr. Jones met the education and experience requirements, while Mr. D'Eliseo did not. But based on the applicants' employment history and interview performance, Natchaug concluded that Mr. D'Eliseo met the "[o]ther" requirements, while Mr. Jones did not.

Thus Natchaug was presented with two candidates, neither of whom possessed all of the qualities listed as "[q]ualifications" on the nurse manager job posting. Plaintiff argues that the requirements he met should have weighed more heavily, but Natchaug concluded that the requirements Mr. D'Eliseo met were of greater importance in hiring a nurse manager. In the absence of any evidence signaling that Natchaug's decision was motivated by discrimination or that Ms. Sullivan's conclusions about the candidates' skills were inaccurate, the Court will not "sit as a super-personnel department that reexamines [Defendant's] judgments" about the relative importance of its stated hiring criteria. *Moy*, 712 F. App'x at 42. Plaintiff's disagreement with Natchaug's weighing of that criteria does not demonstrate that "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the

job in question." *Byrnie*, 243 F.3d at 103. Defendant's motion for summary judgment will be granted as to Plaintiff's failure to promote claims.

**B. Retaliation**

Plaintiff also brings claims for retaliation under Title VII and the CFEPA, alleging that he was terminated from his position at Natchaug Hospital in retaliation for his filing of a CHRO complaint regarding the promotion of Mr. D'Eliseo to Nurse Manager.

The burden-shifting framework laid out in *McDonnell Douglas* also governs Plaintiff's retaliation claim. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir.2013). "To make out a prima facie case of retaliation, plaintiff must show that (1) []he engaged in a protected activity; (2) [his] employer was aware of this activity; (3) the employer took adverse employment action against [him]; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Id.* (internal quotations omitted). "Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Id.* "If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." *Id.*[2]

---

[2] For Title VII retaliation claims, retaliation must have been a "'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Gomez v Metro Dist.*, 10 F. Supp. 3d 224, 235 (D. Conn. 2014) (citing *Univ. of Texas SW Med. Ctr. v. Nassar*, 570 U.S. 338, 348-349 (2013)). Although CFEPA and Title VII are generally interpreted and applied jointly, Connecticut superior courts have frequently declined to apply this "but for" causation standard to CFEPA retaliation claims. (*See* Def.'s Mem. at 15.) Federal courts vary in their treatment of CFEPA retaliation claims. (*See id.* at 15 n.1.) The Court recognizes this discrepancy but need not determine which standard applies to analyze Defendant's entitlement to summary judgment on the retaliation claim.

15

Defendant argues that Plaintiff cannot make out a prima facie case of retaliation because he cannot demonstrate that he suffered an adverse employment action because Plaintiff voluntarily resigned from his job as a Registered Nurse at Natchaug Hospital. "Courts have recognized that, if the employment action at issue is the result of the plaintiff's voluntary resignation . . . then the requirement of an adverse employment action is not satisfied." *Singh v. New York State Dept. of Taxation and Finance*, 911 F. Supp. 2d 223, 234 (W.D.N.Y. 2012) (citing cases).

Plaintiff argues that he has demonstrated that he "suffered an adverse employment action when he was asked to file an immediate resignation." (Pl.'s Opp. at 9.) In support of this position, Plaintiff cites only to a portion of the transcript of his deposition which makes no mention of being asked or forced to immediately resign from Natchaug. (*See* Pl.'s Dep. at 143.) Moreover, Plaintiff agreed with the assertion in Defendant's Local Rule Statement that Plaintiff's "union representative . . . advised Plaintiff to resign immediately" on December 8 and that Plaintiff did immediately resign by email that day. (Parties' L.R. Stmts. ¶¶ 28-29.)

Plaintiff also argues that his resignations "were tendered as part of the agreed transfer to the Hartford HealthCare Emergency Room position at Windham Hospital," (Pl.'s L.R. Stmt. ¶ 29), and that he suffered an adverse employment action when "the transfer position previously arranged was rescinded," (Pl.'s Opp. at 9). But regardless of whether Plaintiff suffered an adverse employment action at the hands of Windham Hospital or Hartford HealthCare, he has offered no evidence to suggest that the Defendant in this case, Natchaug Hospital, forced him to resign or participated in any way in the rescission of the Windham job offer. Because Plaintiff acknowledges that his union representative advised him to voluntarily resign from Natchaug and he subsequently did so, and in the absence of any evidence in the record that Natchaug took any

16

adverse employment action against Mr. Jones, Plaintiff cannot meet his burden at the prima facie stage of his retaliation claim. Defendant's motion for summary judgment is therefore granted as to those claims.

### III. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. # 32] is GRANTED. Judgment shall enter for Defendant. The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 25th day of September 2019.